CENTRAL STATES, SOUTHEAST AND )
SOUTHWEST AREAS PENSION FUND AND )
ARTHUR H. BUNTE, JR. )
 ) No. 13 C 9112
 PLAINTIFFS, )
 )
 v. ) Judge Thomas M. Durkin
 )
BULK TRANSPORT, CORP., )
 )
 DEFENDANT. )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Central States, Southeast and Southwest Areas Pension Fund and Arthur H. Bunte, one of its trustees (collectively, the "Fund"), seek a declaratory judgment that the Fund properly denied defendant Bulk Transport Corporation's ("Bulk") request for a refund of pension contributions that it made on behalf of Terry Loniewski, one of its employees. *See* R. 1 ¶ 8; *see also id.* at 8. Bulk has filed a counterclaim seeking a declaration that the Fund improperly denied its refund request. *See* R. 8 ¶¶ 75-80 (Count III). The parties have filed cross motions for summary judgment. For the following reasons, the Court grants the Fund's motion, and denies Bulk's motion.

## BACKGROUND

### I. Factual Background

The Fund is a multiemployer pension plan under the Employee Retirement Income Security Act ("ERISA"), as amended by the Multiemployer Pension Plan

Amendment Act ("MPPAA"). *See* R. 34 ¶ 4; *see also* 29 U.S.C. § 1002(37). The Court

infers from the record that Bulk is an Indiana trucking company. *See* R. 34 ¶¶ 6, 16.

Terry Loniewski began working for Bulk as a mechanic in or around 1972. *See* R. 34

¶ 8. Bulk made pension fund contributions on Loniewski's behalf from the outset of

his employment. *See id.* at ¶ 8. Since at least 1990, Bulk reported Loniewski to the

Fund as an employee covered by collective bargaining agreements ("CBAs") between

Bulk and Local 135 of the International Brotherhood of Teamsters ("Local 135"). *See*

R. 34 ¶¶ 7-8.[1] In connection with the contributions it made on behalf of Local 135

employees, Bulk completed reporting forms containing the following Certification

Clause:

> The employer hereby reaffirms his obligation to make contributions
> required by the Collective Bargaining Agreement and further
> represents that all employees eligible to participate in the Fund, in
> accordance with the rules of the Fund and the "Employee Retirement
> Income Security Act of 1974," are being reported and only those
> eligible employees are being reported.

*See id.* ¶ 29; R. 27-3 at 6; R. 27-5 at 85. Bulk also paid union dues to Local 135 on

Loniewski's behalf. R. 34 ¶ 33.

Prior to 2004, Bulk and Local 135 were parties to two separate CBAs, one

covering "highway work" (the "Construction CBA") and the other covering "non-

construction site work" (the "Yard CBA"). *Id.* ¶ 18. The Pension Plan contains

multiple "Benefit Classes" providing different benefit levels and associated

---

[1] Bulk denies that it reported Loniewski "as an employee covered by the Local 135
CBAs" before 1990. R. 34 ¶ 8; *see also id.* at ¶ 7 ("Bulk denies that the agreements
were with Local 135 for over 40 years."). It has not identified the agreement(s)
pursuant to which it made pension contributions for Loniewski prior to that date.

contribution rates. *Id.* ¶ 19. The Construction CBA required "Benefit Class 16" contributions (up to $85 per week), and the Yard CBA required "Benefit Class 9" contributions ($33 per week). *Id.* A "Twenty-Year Service Pension Benefit" at age 60 is $485 per month at Benefit Class 9, and $900 per month at Benefit Class 16. *Id.*; *see also* R. 27-8 at 33, 40. In or around 1999, the Fund's Field Services Department

> was advised by Bulk employees that the selection of employees who were reported under the Benefit Class 16 Agreement was not based upon whether the employee was performing construction work. Instead, the Bulk employees indicated that Bulk had adopted the practice of reporting employees under the Benefit Class 9 Agreement until they were within 5 years of retirement, at which time they were reported under the Benefit Class 16 Agreement so that the employees would receive a full Benefit Class 16 pension at retirement.

R. 27-5 at 9 (Minutes of the Pension Board Meeting, February 19, 2003 ("Feb. 19, 2003 Minutes")); *see also* R. 34 ¶ 20. According to the Fund, this practice violated the Pension Plan's "adverse selection rule." R. 27-5 at 12.[2] Bulk conceded that since 1995 it had "transferred" five employees from the Yard CBA to the Construction CBA, including Loniewski, but maintained that it did so at Local 135's request. R.

---

[2] The Fund's adverse selection rule provides that a CBA shall be acceptable only if such agreement "requires a Contributing Employer to make Employer Contributions . . . at the same rate on behalf of all Employees in a Bargaining Unit." R. 27-8 at 30 (Pension Plan); *see also* R. 27-6 at 14. "This rule prohibits any 'arrangement [that] restricts pension coverage to only those employees likely to receive a benefit and excludes those employees less likely to receive a benefit.'" *Cent. States, S.E. and S.W. Areas Pension Fund v. Blue Sky Heavy Hauling, Inc.*, No. 08–CV–3338, 2011 WL 2142816, at *3 (N.D. Ill. May 31, 2011); *see also Cent. States, S.E. and S.W. Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1155 (7th Cir. 1989) (From an actuarial perspective, a defined-benefit plan "works only if the plan receives contributions on behalf of persons who will not get benefits."); R. 51-2 (1990 Special Bulletin 90-7).

34 ¶¶ 20-21.[3] As of February 2003, two of those five employees had already retired and had "been receiving Benefit Class 16 pensions for 2 years." R. 27-5 at 12 (Feb. 19, 2003 Minutes). The Fund estimated that the Benefit Class 16 benefits already paid to the two retirees, and that would be owed to the three active employees upon their retirement (including Loniewski), would "exceed the contributions paid on their behalf by $37,000." *Id.*

In 2003, Bulk and the Fund executed a Settlement Agreement and Release pursuant to which Bulk agreed to pay the Fund $40,000. *See* R. 34 ¶¶ 23, 25; *see also* R. 27-5 at 20, ¶ 1. The Settlement Agreement further provided that Bulk would continue to pay the Class 16 contribution rate on behalf of Loniewski and the other two active employees whom it had "transferred" to the Construction CBA:

> 2.     The Pension Fund and Bulk agree that the following individuals will be red-circled and will have contributions remitted on their behalf at the Benefit Class 16 contribution rate of $85 per week for as long as they continue to be covered by any collective bargaining agreement between Bulk and Local 135 regardless of whether they perform work under the Construction Agreement, the Yard Agreement or any other labor agreements between Bulk and Local 135: Gary D. Frye, Robert W. Hayes and Terry J. Loniewski. Bulk will not contribute to the Pension Fund after the execution of this Agreement on behalf of any other employee represented by Local 135 at the $85 weekly rate, unless Bulk and Local 135 agree that the $85 weekly rate will be due on behalf of all of the employees of Bulk represented by Local 135. Bulk will not contribute to the Pension Fund after the execution of this Agreement on behalf of Frye, Hayes or Loniewski at a rate in excess of the $85 weekly rate, unless Bulk and Local 135 have agreed that Bulk

---

[3] *See also* R. 27-5 at 10 (Feb. 19, 2003 Minutes) (Bulk "conceded that the selection of employees that were reported under the Benefit Class 16 Agreement was not based upon whether the employees was performing construction work. However, it blamed Local 135 for the problem, arguing that Bulk had shifted the employees to the Benefit Class 16 contract billing only when Local 135 insisted that it do so.").

will contribute at the very same rate in excess of the $85 weekly rate on behalf of all of Bulk's other employees represented by Local 135.

3.    The Pension Fund agrees to accept the current and any future Construction Agreement and the current and any future Yard Agreement between Bulk and Local 135, even if the $85 contribution rate paid on behalf of the three individuals listed in paragraph 2 is different from the contribution rate paid by Bulk on behalf of other employees represented by Local 135 who perform the same work as the three individuals listed in paragraph 2. This paragraph shall not prevent the Pension Fund from refusing to accept any Construction Agreement, Yard Agreement or other agreement between Bulk and Local 135 submitted after the execution of this Agreement that is otherwise inconsistent with the Pension Fund's rules.

R. 34 ¶ 25. At no point during the audit process, or during settlement negotiations, did Bulk contend that Loniewski was not covered by a Local 135 CBA. *Id*. at ¶ 24.

In April 2004, Bulk and Local 135 combined the Construction and Yard CBAs into a single CBA. R. 40 ¶ 13; *see also* R. 27-3 at 31-32, 27-4 at 1-18 (CBA between Local 135 and Bulk, April 1, 2004 – March 31, 2009 (the "2004 CBA")). Article 16 of the 2004 CBA, entitled "Pension," included the following provision:

**Section 16.01.** Except as otherwise provided herein, effective April 1, 2009, the Employer shall contribute to the [Fund], the sum of thirty ($30.00) per week for each eligible employee covered by this Agreement who has been on the payroll thirty (30) days or more. In accordance with a settlement agreement and release made and entered into between Employer and [the Fund] in 2003, Employer agrees to contribute to the [Fund] the sum of eighty-five dollars ($85.00) per week for the following employees: Gary D. Frye, Robert W. Hayes, and Terry J. Loniewski.

R. 27-4 at 13. An employee of the Fund, Carol Huron, reviewed the 2004 CBA and prepared a "Contract Policy/Review Checklist" summarizing its terms. R. 40 ¶ 14. Next to the heading "CLASSIFICATIONS," Huron wrote: "Drivers." R. 34-1 at 12.[4]

In April 2009, Bulk and Local 135 renewed the 2004 CBA. *See* R. 40 ¶ 15; *see also* R. 27-4 at 19-29 (CBA between Local 135 and Bulk, April 1, 2009 – March 31, 2014 (the "2009 CBA")). Section 16.01 of the 2009 CBA largely mirrors the same section of the 2004 CBA:

> **Section 16.01.** Except as otherwise provided herein, effective April 1, 2009, the Employer shall contribute to the [Fund], the amount listed below per week for each eligible employee covered by this Agreement who has been on the payroll thirty (30) days or more.
>
> | 4/1/2009 | 4/1/2010 | 4/1/2011 | 4/1/2012 | 4/1/2013 |
> |----------|----------|----------|----------|----------|
> | $35.00 | $37.80 | $40.80 | $44.10 | $46.80 |
>
> In accordance with a settlement agreement and release made and entered into between Employer and [the Fund] in 2003, Employer agrees to contribute to the [Fund] the amount listed below per week for the following employees: Gary D. Frye and Terry J. Loniewski.[5]
>
> | 4/1/2009 | 4/1/2010 | 4/1/2011 | 4/1/2012 | 4/1/203 |
> |----------|----------|----------|----------|---------|
> | $99.10 | $107.00 | $115.60 | $124.80 | $132.30 |

R. 27-4 at 27; *see also* R. 34 ¶ 28. Huron completed another "Contract & Policy Information Sheet" summarizing the terms of the 2009 CBA. *See* R. 34-1 at 24. As she had in connection with the 2004 CBA, Huron wrote "Drivers" next to the heading "CLASSIFICATION(s)." *Id.*

---

[4] According to the Fund, Huron was "in a bargaining unit represented by Teamster Local Union 743 who had no management authority." R. 40-1 ¶ 5 (Aff. of Juan Beaton, Group Manager of Operations Accounting at the Fund).

[5] Robert Hayes retired in 2009, so the parties omitted his name from § 16.01 in the 2009 CBA. R. 34 ¶ 28.

## II. Bulk's 2010 Partial Withdrawal Liability Assessment & Refund Request

In May 2012, the Fund's Board of Trustees (the "Board") approved a 2010 partial withdrawal liability assessment of $415,235.31 based upon its determination that Bulk had triggered a 70% decline in Bulk's participation in the Fund. R. 34 ¶ 13. In November 2012, Bulk sent a letter to the Fund asking it to review its withdrawal liability determination. R. 34 ¶ 14; R. 34-2 at 12 (Letter from M. Trapp to A. Sprau, dated Nov. 5, 2012). Bulk argued that it could not have triggered a partial withdrawal in 2010 because it had completely withdrawn in either 2004 or 2009. R. 34-2 at 12. This was so, according to Bulk, because: (1) the provision of the 2004 CBA creating separate contribution rates for Loniewski, Frye, and Hayes violated Pension Plan's adverse selection rule, *see supra* n. 2; and (2) the CBAs apply to drivers, not mechanics (like Loniewski), and the last Local 135 *driver* working for Bulk retired in 2009 and was not replaced. *Id.* at 12-13. In connection with the second argument, Bulk asked the Fund to refund all contributions that it had made on Loniewski's behalf within the prior ten years (the refund limit imposed by the Pension Plan). *Id.* at 13 n.2. Bulk argued that it had made those contributions "pursuant to a mistake of fact or law" because Loniewski was "never appropriately part of the bargaining unit, or a proper contributee under the Plan." *Id.* Notwithstanding this argument, Bulk contributed another $998.40 to the Fund on Loniewski's behalf after making its refund request. R. 34 ¶ 30.

In December 2012, Bulk repudiated the 2009 CBA. *See* R. 34 ¶ 34. In a letter dated December 11, 2012, Bulk notified Bill Turner, a Local 135 representative,

that the company was repudiating the CBA because it had only one permanent Local 135 employee (Loniewski):

> As you know, [Bulk]'s owners and management team have had a good relationship with Local 135 for many years, and we have enjoyed that working relationship. However, for some time, we have only had one permanent Local 135 employee, and we have no reason to believe that this situation will change in the foreseeable future.

> Accordingly, this letter will confirm that, effective immediately, [Bulk] is repudiating the [2009 CBA] in its entirety and will no longer recognize the union.

*Id.*; *see also* R. 27-5 at 33. Under a separate cover letter enclosing the letter to Turner, Bulk notified the Fund that it had repudiated the 2009 CBA and, "[a]ccordingly," "no longer has a legal duty to make any contributions to the Fund." R. 34 ¶ 35; *see also* R. 27-5 at 32. Bulk laid off Loniewski on December 27, 2012, ostensibly because it did "not have Local 135 bargaining work available and does not anticipate obtaining any such work." R. 27-5 at 97.

## III.  The Fund's Investigation and March 2013 Ruling Regarding Bulk's Refund Request

Bulk's November 5, 2012 letter constituted a request for review by the Fund under the MPPAA. *See* 29 U.S.C. § 1399. The Fund assigned Kathryn Hucker to investigate and research Bulk's refund request. R. 51 at 2. On November 28, 2012, Hucker spoke with Turner, Local 135's representative, by telephone. *Id.* at 8. In a call log that Hucker prepared, she summarized the call as follows:

> Bill stated Terry Loniewski has been the only employee for quite a while. The drivers stopped being employed a while back but wasn't sure when. The equipment, trucks, were originally sitting at the yard not being utilized until Bulk decided to lease them to the steel mills

which are outside of his jurisdiction. Loniewski performs mechanic work on the equipment that is leased to the steel mills.

Bill will look into contract and call me back.

*Id.*; *see also* R. 34-1 at 17. The call log goes on to summarize a voicemail that Hucker received from Turner the next day:

Bill stated Terry Loniewski has been the only employee for quite a while. The drivers stopped being employed a while back but wasn't sure when. The equipment, trucks, were originally sitting at the yard not being utilized until Bulk decided to lease them to the steel mills which are outside of his jurisdiction. Loniewski performs mechanic work on the equipment that is leased to the steel mills.

*Id.*

In early December 2012, Hucker prepared a typewritten report summarizing her investigation to that point. R. 51-8 at 1-2; R. 51-5 at 76-77 (Hucker Dep.). The report summarized Bulk's position and certain background details (e.g., the 1997-99 audit, the CBAs, etc.). R. 51-8 at 1-2. On or before December 14, 2012, Hucker added handwritten notes to a physical copy of her report. R. 51-5 at 94-95. Among other things, Hucker wrote "Pull legal file (Susan Lange)," and just below that notation, "Refund request denial + RR response." R. 51-8 at 2; *see also* 51-5 at 97 (Hucker testifying that "RR" stood for "refund request"). In her deposition in the parties' pending withdrawal-liability arbitration, Hucker testified that she had learned from conversations with the Fund's attorneys that "a refund request denial and a review request response [were] coming." *Id.* at 102.

In early March 2013, Albert Madden, a member of the Fund's legal staff, gave the Board documents relevant to Bulk's request, including an agenda item that he

had prepared summarizing the parties' positions. *See* R. 67 at 8-9; R. 63-2 at 80 (Madden Dep.). Approximately a week later, on March 12, 2013, "[a]fter a full discussion, including a presentation by Albert Madden," the Board unanimously voted to deny Bulk's refund request. R. 27-3 at 9. Bulk had consistently treated Loniewski as a covered employee by making pension contributions on his behalf for more than forty years. *Id.* at 11. Furthermore, Bulk certified that it was required to make those contributions and that Loniewski was an "eligible employee[]." *Id.* The Settlement Agreement provided that Bulk would make contributions on behalf of the "red-circled" employees (including Loniewski) "for so long as they *continue* to be covered by any collective bargaining agreement between Bulk and Local 135 . . . ." R. 27-5 ¶ 2 (emphasis added); *see also* R. 27-3 at 10. Section 16.01 of the 2004 and 2009 CBAs "incorporated" the Settlement Agreement and renewed Bulk's commitment to make contributions on Loniewski's behalf. R. 27-3 at 10. Also, Bulk deducted union dues from Loniewski's wages and forwarded them to Local 135. *Id.* at 11. The Board noted that Local 135 cited these same considerations as support for its belief that Loniewski was covered during the relevant time period. *Id.* The Board also reasoned that Bulk's actions after it first requested a refund contradicted its theory: (1) after its request, Bulk contributed to the Fund on Loniewski's behalf for work he performed in October and November 2012; (2) it appeared to recognize in correspondence with Local 135 and Loniewski that Loniewski was indeed a member of Local 135; and (3) Bulk told Loniewski in December 2012 that his "Central States' pension benefit was secure." *Id.* Finally,

the Board found that Bulk had not identified any "mistake"—"Bulk simply claimed the contributions were not due without offering any explanation for how it could have continuously made contributions on Loniewski for over 40 years that were not due." *Id.* at 12. So, even if the contributions were not due, Bulk was not entitled to a refund because it "had not identified a mistake of law or fact that led to the payments as required by the Trust Agreement. *Id.*

## IV. Bulk's 2011/2012 Withdrawal Liability and Renewed Request for a Refund

On March 27, 2013, Bulk initiated an arbitration challenging the Fund's 2010 partial withdrawal liability assessment. R. 8 ¶ 17 (Bulk's Answer, Defenses and Counterclaim). The Fund later assessed additional withdrawal liability for a partial withdrawal occurring on December 31, 2011 ($86,687.75), and a complete withdrawal occurring on December 29, 2012 ($237,768.18). *Id.* ¶¶ 18-19, 21-22. On May 17, 2013, Bulk received notice of the Fund's demand for payment of Bulk's 2011 partial withdrawal liability and the 2012 complete withdrawal liability. *Id.* at ¶¶ 20, 23. On August 13, 2013, Bulk asked the Fund to review the 2011 and 2012 assessments. *Id.* ¶ 24. In connection with that review request, Bulk renewed its request for a refund of the contributions it had made on Loniewski's behalf. R. 34 ¶ 39; *see* R. 27-6 at 10-15 (Letter from M. Trapp to C. Brown, dated Aug. 13, 2013). The Board concluded that Bulk's renewed request largely "repeat[ed], with additional elaboration," arguments that it had made in its original request for review. R. 27-6 at 2-3. On November 19, 2013, the Board reaffirmed its prior findings and addressed at greater length Bulk's argument that the 2003 Settlement

Agreement violated the Fund's adverse selection rule. *Id.* at 6-9. The Board concluded that it has discretion under the Trust Agreement to determine whether an agreement violates that rule and, if so, whether it will reject an agreement on that basis. *Id.* at 8-9. In 2003, the Fund exercised its discretion to enter into the Settlement Agreement pursuant to its conclusion that the "economic terms were favorable to the Fund." *Id.* at 9.

## V.      Procedural History

On December 20, 2013, the Fund filed its complaint in this case seeking, among other things, a declaratory judgment that "the Trustees' denial of [Bulk's] refund request was proper." R. 1 at 8. Bulk filed a counterclaim dealing in large part with the arbitration rules applicable to its 2011 and 2012 withdrawal-liability assessments. *See* R. 8.[6] Bulk also requested an order granting its refund request. *Id.* at 22-23. The parties' cross-motions for summary judgment with respect to the refund are currently before the Court.

### LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all

---

[6] This portion of Bulk's counterclaim was the subject of its motion for a preliminary injunction, R. 10, which the Court denied on May 19, 2015. R. 79. The Court has under advisement the parties' arguments regarding the merits of Bulk's amendment to its counterclaim concerning the procedures governing arbitration. *See* R. 85.

of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## I.    The Standard of Review

### A.    The Arbitrary and Capricious Standard of Review Applies

In a lawsuit challenging a decision of an ERISA plan administrator, "in this case the Trustees," the "standard of review depends on the amount of discretion that plan documents afford the" administrator. *Militello v. Cent. States, S.E. and S.W. Areas Pension Fund*, 360 F.3d 681, 686 (7th Cir. 2004). The Trust Agreement grants the Trustees discretionary authority to make decisions regarding matters affecting the Fund:

> All questions or controversies, of whatsoever character, arising in any manner or between any parties or persons in connection with the Fund or the operation thereof, whether as to any claim for any benefits preferred by an participant, beneficiary, or any other person, or whether as to the construction of the language or meaning of the rules and regulations adopted by the Trustees *or of this instrument, or as to any writing, decision, instrument or accounts in connection with the operation of the Trust Fund or otherwise*, shall be submitted to the Trustees, or to a committee of Trustees, and the decision of the Trustees, or of such committee thereof shall be binding upon all parties or persons dealing with the Fund or claiming any benefit thereunder. *The Trustees are vested with discretionary and final authority in making all such decisions*, including Trustee decisions upon claims for

benefits by participants and beneficiaries of the Pension Fund and other claimants, and including Trustee decisions construing plan documents of the Pension Fund.

R. 27-7 at 20 (emphasis added). This language gives the Trustees "discretionary and final authority" to: (1) interpret the Trust Agreement, the CBAs, and the 2003 Settlement Agreement; and (2) grant or deny contribution refund requests. *See* R. 27-7 at 26 (Trust Agreement Art. XIV, § 1). Thus, the Board's decisions denying Bulk's November 2012 and August 2013 refund requests "will be reviewed under an arbitrary and capricious standard." *Militello*, 360 F.3d at 685. "Under the arbitrary and capricious standard, an administrator's decision will not be overturned if (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass important aspects of the problem." *Id.* (citation and internal quotation marks omitted); *see also Black v. Long Term Disability Ins.*, 582 F.3d 738, 745 (7th Cir. 2009) ("Under the arbitrary and capricious standard of review, we may overturn a benefit administrator's decision only if the decision is 'downright unreasonable.'" (quoting *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 606 (7th Cir. 2007))).

Bulk emphasizes that ordinary principles of contract interpretation still apply, R. 33 at 5-6, and therefore the Board cannot adopt an interpretation of the relevant agreements contrary to their plain meaning. *See* R. 33 at 5-6. But as the Fund points out, *see* R. 39 at 3-4, this principle does not change the standard of

review. That is, the Board's decision *is* arbitrary and capricious if it is contrary to the plain meaning of the relevant agreements. *See Swaback v. Am. Info. Tech. Corp.*, 103 F.3d 535, 540 (7th Cir. 1996) ("[I]f fiduciaries or administrators of an ERISA plan controvert the plain meaning of a plan, their actions are arbitrary and capricious.") (collecting cases); *see also Huss v. IBM Med. and Dental Plan*, 418 Fed. Appx. 498, 503 (7th Cir. 2011) (same). At the same time, it is not the Court's role to substitute its own judgment for Fund's, provided it is reasonable. *See Mote*, 502 F.3d at 606 ("[T]his court will not substitute the conclusion it would have reached for the decision of the administrator, as long as the administrator makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts.") (citation and internal quotation marks omitted).

## B. Bulk Has Not Shown that the Board's Decision is Entitled to Diminished Deference

Bulk extensively argues that the Court should not defer to the Board's findings and conclusions, citing alleged conflicts of interest and procedural irregularities. The arbitrary and capricious standard is "a range, not a point." *Manny v. Cent. States, S.E. and S.W. Areas Pension and Health and Welfare Funds*, 388 F.3d 241, 242 (7th Cir. 2004) (citation and internal quotation marks omitted). "It is 'a sliding scale' that requires that judicial review be 'more penetrating the greater is the suspicion of partiality, less penetrating the smaller that suspicion is.'" *Id.* (quoting *Chojnacki v. Georgia-Pacific Corp.*, 108 F.3d 810, 815 (7th Cir. 1997)). Bulk argues that the following factors warrant "more penetrating" judicial review: (1) the Board's interest in retaining Bulk's contributions and obtaining the full

amount of Bulk's assessed withdrawal liability;[7] (2) the Fund's alternative argument in the arbitration proceeding that the 2004 and 2009 CBAs apply to Loniewski, irrespective of whether they apply to any other mechanic; (3) Bulk's contention that Turner never made the statements attributed to him by the Fund's staff; and (4) evidence that, according to Bulk, shows that the Fund "prejudged" Bulk's refund request.

*First*, Bulk's conflict-of-interest argument is meritless. There is no evidence that the individual Trustees have any personal stake in Bulk's contributions and withdrawal liability. Also, Bulk does not dispute the Fund's contention that there are an equal number of union and employer representatives on the Board. *See* R. 67 at 5. As such, there is no inherent conflict of interest. *See Manny*, 388 F.3d at 243 (no conflict of interest because the trustees, consisting of an equal number of union and employer representatives, unanimously voted to turn down plaintiff's benefits application); *see also Musson Bros., Inc. v. Cent. States*, 13 C 3506, 2014 WL 1356611, at *7 (N.D. Ill. Apr. 2, 2014) (reaching the same conclusion in a case challenging the Board's conclusion that the plaintiff employer was obligated to pay delinquent contributions on behalf of certain employees).

*Second*, the Court also rejects Bulk's argument that the Fund has improperly changed its legal theory. According to Bulk, the Fund has argued in the parties'

---

[7] If Bulk was not obligated to make pension contributions on Loniewski's behalf because he was a mechanic, then it withdrew from the Fund in 2009 when Bulk's last Local 135 driver retired. The parties agree that such a finding would decrease Bulk's withdrawal liability, although they disagree by what amount ($250,000 according to the Fund, $266,382.80 according to Bulk). *See* R. 59-1 at 4, R. 63 at 12.

withdrawal-liability arbitration that it is irrelevant whether the CBAs covered mechanics, generally, or just Loniewski. R. 51 at 4-6. It would needlessly lengthen this opinion to fully describe and unpack Bulk's argument and the Fund's response. *See* R. 51 at 3-6; R. 59-1 at 11-15. Suffice it to say that any tension between the Fund's position in this case and in the arbitration—which, if it exists, is not nearly as significant as Bulk represents—does not diminish the Court's deference to the Board's determination. The issue in this case is whether the Board's conclusion that the Local 135 CBAs covered Loniewski is reasonable. It is irrelevant whether the Fund has suggested alternative grounds for reaching the same conclusion in the arbitration.

*Third*, Bulk overstates the "procedural irregularities" in the Fund's review. The fact that someone in the Fund's legal department told Hucker on or before December 14, 2012 that a denial was forthcoming is unusual. But ultimately, the Board—not the Fund's staff—decides whether to grant an employer's refund request. Madden states in his affidavit that: (1) the Board was not consulted prior to the March 12, 2013 meeting; (2) he did not know which way the Board would ultimately rule; and (3) before the meeting he prepared a proposed finding granting Bulk's refund request in the event that the Board agreed with Bulk's position. R. 58-4 ¶ 7. Bulk's position did not materially change between its initial refund request and the Board's meeting, and the agenda item and background materials adequately presented its view for the Board's consideration. Indeed, Bulk received a

second bite at the apple when the Board considered its renewed refund request in November 2013.

With respect to the agenda item purporting to set forth Local 135's view, Bulk initially argued that it was a wholesale fabrication because it did not match Hucker's description in the call log of her discussion with Turner. R. 51 at 7-12. In response, the Fund explained that Madden drafted the agenda item based upon his discussion with the Fund's Director of Benefit Services, Albert Nelson, not Hucker. R. 59-1 at 5-6. At Madden's request, Nelson had contacted Local 135 concerning Loniewski. R. 58-1 ¶ 3 (Nelson Aff.). Nelson states that he spoke with Danny Barton, Local 135's President, and that he may have spoken with Turner. *Id.*; *see also* R. 59-1 at 5-6. According to Nelson, Barton told him that Loniewski was covered by the CBAs because he was specifically mentioned in those agreements and was "a dues paying member of Local 135." R. 58-1 ¶ 4. Madden believes that Nelson told him that he (Nelson) spoke with Turner, but acknowledges that "it is possible he did not identify who he spoke with at Local 135 and I only assumed it was Bill Turner." R. 58-4 ¶ 5 (Madden Aff.). In any event, the substance of the agenda item is consistent with what Nelson says Barton (and/or Turner) told him. In response to this explanation, Bulk shifts gears and argues that: (1) it is suspicious that the Fund's staff "bent over backwards to repeatedly solicit the views of Local 135"; and (2) the information that the Fund received from Local 135 was biased and unpersuasive. R. 63 at 4-8. The first argument is borderline frivolous,

and the second goes to the weight of Local 135's input. Neither argument persuades the Court to doubt the Board's impartiality.

### C.      Bulk is Not Entitled to Discovery

In its opening brief, Bulk asked the Court for leave to conduct "full discovery." R. 33 at 20. In general, courts reviewing administrative decisions confine their review to the administrative record that was before the decisionmaker. *See Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan*, 195 F.3d 975, 981-82 (7th Cir. 1999) ("Deferential review of an administrative decision means review on the administrative record."). But "[w]here a claimant makes specific factual allegations of misconduct or bias in a plan administrator's review procedures, limited discovery is appropriate." *Semien v. Life Ins. Co. of N. A.*, 436 F.3d 805, 815 (7th Cir. 2006). "A claimant must demonstrate two factors before limited discovery becomes appropriate. First, a claimant must identify a specific conflict of interest or instance of misconduct. Second, a claimant must make a prima facie showing that there is good cause to believe limited discovery will reveal a procedural defect in the plan administrator's determination." *Id*. For the reasons the Court has just explained, Bulk has not: (1) identified a specific conflict of interest or instance of misconduct; and (2) made a prima facie showing that discovery will reveal a defect in the Board's procedures. Notwithstanding the fact that Bulk is not entitled to discovery, it has evidently conducted substantial discovery in the ongoing arbitration proceeding regarding the very issues it has raised in this case. Bulk has had ample opportunity to explore its theories regarding

the Board's motivations, and it has—with the Court's leave—extensively briefed those issues. *See* R. 33, 51, 63, 71.

## II.    The Board's Decision Was Reasonable

Bulk emphasizes the fact that the CBAs, by their terms, only refer to "drivers." In support of this argument, Bulk cites a number of provisions from the CBAs. The CBAs define the "bargaining unit" as "all regular full-time drivers who are members of Local 135, employed by [Bulk] and regularly dispatched from its Michigan City, Indiana, terminal." R. 27-3 at 32 (2004 CBA § 1.01). Under the heading "Scope of Agreement," the CBA states that "[t]his Agreement covers all driving services performed by members of the bargaining unit on behalf of Employer." *Id.* (2004 CBA § 2.01). The "Wages and Classifications" section only states the "[w]age rate for drivers." R. 27-4 at 5 (2004 CBA § 6.01). The Pension Plan, in turn, defines "Collective Bargaining Agreement" as a "written agreement between a Union and a Contributing Employer requiring Employer Contributions to the Pension Fund on behalf of all Employees *whose classification of work* is covered by the Collective Bargaining Agreement." R. 27-8 at 10 (§ 1.06) (emphasis added). Because Loniewski's "classification" (mechanic) was not covered by the CBAs, Bulk argues that it was not obligated by the Pension Plan to make contributions on his behalf. So, based on this analysis, Bulk contends that it was obligated to make contributions on Loniewski's behalf *only if* he worked as a driver.  R. 33 at 8-9. Loniewski was classified as a mechanic and *never* worked as a driver. Thus,

according to Bulk, it was not obligated to make contributions on his behalf and the contributions that did make were mistaken.

Bulk's interpretation is contrary to the parties' lengthy course of dealing and is not required by the CBAs' plain language. Bulk made pension contributions on Loniewski's behalf for over forty years, and there is no suggestion in the record that it was somehow unaware that Loniewski (its own employee) was a mechanic. If, as Bulk argues, it was never obligated to make those contributions, then who at the company made the initial mistake? Why was it made? And why did the supposed mistake, which presumably could have been corrected at any time, continue for so long? Bulk did not provide the Board with any evidence (or argument) addressing these issues. *See* R. 27-3 at 12, ¶ 7 ("Bulk simply claimed [in its refund request that] the contributions were not due without offering any explanation for how it could have continuously made contributions on Loniewki for over 40 years that were not due.").

Even if Loniewski had somehow flown under the radar for 30 years, he could not have continued to do so after Bulk and the Fund executed the Settlement Agreement in 2003. In that agreement, Bulk expressly agreed to make contributions on Loniewski's behalf so long as he "*continue[d]* to be covered by any collective bargaining agreement between Bulk and Local 135." And it renewed that commitment in § 16.01 of the 2004 and 2009 CBAs.[8] Bulk's agreement in § 16.01 to

---

[8] *See* R. 27-4 at 13 (2004 CBA: "*In accordance with a settlement agreement and release* made and entered into between Employer and [the Fund] in 2003, Employer agrees to contribute to the [Fund] the sum of eighty-five dollars ($85.00) per week

make contributions on Loniewski's behalf is not expressly tied to the performance of a particular type (or classification) of work. Section 16.02, in turn, required Bulk to make contributions on behalf of "eligible employees" for each week in which they "actually work[] at least one (1) hour." In the context of the "Pension" section, an "eligible employee" is any Bulk employee "covered by" the CBA "who has been on the payroll thirty (30) days or more." Bulk expressly agreed in § 16.01 to make pension contributions on Loniewski's behalf. Thus, he was "covered" by the CBA as that term is commonly understood, even if other terms in the agreement apply only to drivers (e.g., wage rates). Consistent with this interpretation of the CBAs, Bulk: (1) continued to make pension contributions on Loniewski's behalf between 2004 and November 2012; and (2) certified that the CBAs required those contributions and that Loniewski was "eligible" to participate in the Fund. *See* R. 34 ¶ 29; R. 27-3 at 6; R. 27-5 at 85. In sum, the terms of the Pension Plan and the Trust Agreement do not support construing the CBAs contrary to their plain language and the parties' long-term course of dealing.

The question remains whether the CBAs, which required contributions, contravened the terms of the Trust Agreement and the Pension Plan. The Board reasoned that the Settlement Agreement (later incorporated by the CBAs) recognized "mechanics" as a "classification" entitled to pension contributions:

---

for the following employees: Gary D. Frye, Robert W. Hayes, and Terry J. Loniewski.") (emphasis added); R. 27-4 at 27 (2009 CBA: *In accordance with a settlement agreement and release* made and entered into between Employer and [the Fund] in 2003, Employer agrees to contribute to the [Fund] the amount listed below per week for the following employees: Gary D. Frye and Terry J. Loniewski.") (emphasis added).

> [T]he language indicating contributions would be paid on any "other employees represented by Local 135 who perform the same work" as the red-circled employees further indicates that Loniewski *(and any other mechanics)* were covered by the Local 135 CBAs.

R. 27-3 at 10, ¶ 1 (emphasis added). The Board's interpretation of the Settlement Agreement and the CBAs is not "downright unreasonable." *See Black*, 582 F.3d at 745 (citation and internal quotation marks omitted). It has a basis in the record, even if the agreements could be construed more narrowly to entitle only Loniewski—and no other mechanics—to benefits. *See Militello*, 360 F.3d at 685 ("Under the arbitrary and capricious standard, an administrator's decision will not be overturned if . . . it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome.").

Also, Bulk overstates the extent to which the CBAs *must* be reconciled with the Trust Agreement and the Pension Plan in order to affirm the Board's decision. The Trust Agreement gives the Board "discretionary and final authority" to decide "questions and controversies" regarding the Fund. R. 27-7 at 20. Citing that provision, the Board reasonably concluded that its "authority to determine whether an agreement violates a Fund rule and if it does, whether and when that agreement will be rejected by the Fund[,] are discretionary authorities, not mandatory duties." R. 27-6 at 9-10, ¶ 2. So, even if the CBAs violated the Fund's "adverse selection" rule by covering "only certain specified individuals, instead of a classification of employment" (*see* R. 51-2, 1990 Special Bulletin 90-7, at 2), the Board had discretion to approve those agreements. *See* R. 27-6 at 10, ¶ 3 (concluding that the Board had authority to approve the Settlement Agreement as being in the best interests of the

Fund). It follows, then, that a CBA that violates the adverse selection rule is not void; rather, it "*may* result in contract rejection or termination of continued participation." *See* R. 51-2, 1990 Special Bulletin 90-7, at 1 (emphasis added). The Board did not reject the CBAs, which by their terms required Bulk to make pension contributions on Loniewski's behalf. That commitment was binding at all times relevant to this lawsuit, and payments made pursuant to a binding commitment are not "mistaken."

Finally, although not expressly cited in the Board's conclusions, the Court agrees with the Fund that the equities favor denying Bulk's refund request. A claim to recover mistaken pension contributions is equitable in nature. *UIU Severance Pay Trust Fund v. Local Union No. 18-U, United Steelworkers of Am.*, 998 F.2d 509, 512-13 (7th Cir. 1993).[9] Bulk contends that the Fund could exercise its discretion and award Loniewski his pension, notwithstanding the fact that Bulk's theory (if accepted) means that Loniewski is not legally entitled to any portion of it. R. 63 at 11-13. That may be true, but the question remains: who should bear the burden of Bulk's purported mistake, Bulk or the Fund? Bulk knew that Loniewski was a mechanic, but nevertheless made pension contributions on his behalf for more than forty years and certified that it was obligated to do so. *See UIU*, 998 F.2d at 513 (relevant factors when deciding whether a refund claim is equitable include whether

---

[9] *UIU* recognized a federal common law claim for refunds of mistaken pension contributions in the absence an ERISA provision creating such a claim. 998 F.2d at 512-13. In this case, the Trust Agreement itself recognizes an employer's right to seek a refund of mistaken contributions. R. 27-7 at 26 (Trust Agreement Art. XIV, § 1). The Court concludes, however, that equitable considerations are still relevant when deciding whether the Board abused its discretion in denying a refund request.

laches applies, and whether the party seeking a refund has ratified its past payments "by continuing the payments for years without apparent question"). It objected to Loniewski's eligibility only after the Fund assessed withdrawal liability in 2012. Under the circumstances, the equities support the Board's decision denying Bulk's refund request.

In sum, the Board's decision denying Bulk's refund request was not arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, the Court grants the Fund's motion for summary judgment, R. 25, and denies Bulk's motion for summary judgment, R. 33.


ENTERED:

_Thomas M Durkin_
Honorable Thomas M. Durkin
United States District Judge


Dated:  June 24, 2015